**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION**

|  |  |
|---|---|
| SHAQUAE MICHELLE HICKMAN, | Case No.: 8:24-cv-584 |
| Plaintiff, | |
| v. | **COMPLAINT AND DEMAND FOR JURY TRIAL** |
| TRANS UNION LLC, and LVNV FUNDING LLC | |
| Defendants. | |

Shaquae Michelle Hickman ("Plaintiff") brings this action on an individual basis, against Defendant Trans Union LLC ("Trans Union") and Defendant LVNV Funding LLC ("LVNV") (together, the "Defendants") for actual, statutory, and punitive damages and costs, and attorney's fees, for violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et. seq.*

## <u>INTRODUCTION</u>

1.      The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

2.      However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, Trans Union acknowledges this potential for misuse and

resulting damage every time it sells its credit monitoring services to a consumer.

3.     The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4.     Trans Union LLC, together with non-parties Equifax Information Services LLC ("Equifax"), and Experian Information Solutions, Inc. ("Experian"), are the three major credit reporting bureaus in the United States.

5.     These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

6.     Since 1970, when Congress enacted the FCRA, federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

7.     "Credit is the lifeblood of the modern American economy, and for the American consumer access to credit has become inextricably tied to consumer credit scores as reported by credit reporting agencies." *Burke v. Experian Info. Sols., Inc.*, 2011 WL 1085874, at *1 (E.D. Va. Mar. 18, 2011).

8.     Congress made the following findings when it enacted the FCRA in 1970:

(a)     The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

(b)     An elaborate mechanism has been developed for investigating and

> evaluating the credit worthiness, credit standing, credit capacity, character, and general reputation of consumers.
>
> (c)    Consumer reporting agencies have assumed a vital role in assembling and evaluating consumer credit and other information on consumers.
>
> (d)    There is a need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy.

15 U.S.C. § 1681(a)(1-4).

9.    Thus, one of the fundamental purposes of the FCRA is "to require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information in accordance with the requirements of this subchapter." 15 U.S.C. § 1681(b). Accordingly, "[t]he FCRA evinces Congress' intent that consumer reporting agencies, having the opportunity to reap profits through the collection and dissemination of credit information, bear 'grave responsibilities.'" *Cushman v. Trans Union*, 115 F.3d 220, 225 (3d Cir. 1997).

10.    The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name **without his knowledge and without reason**. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 cong. Rec. 36570 (1970)] (emphasis added).

11.    Since 1970, when Congress enacted the FCRA, as amended, 15 U.S.C. § 1681 *et.*

*seq.*, the federal law has required CRAs to have in place and to utilize reasonable procedures "to assure the maximum possible accuracy" of the personal and financial information that they compile and sell about individual consumers.

12.     The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted so as to not prevent said consumer from benefiting from his or her credit and obtaining new credit.

13.     In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U. S.C. § 1681(a)(4).

14.     The FCRA also requires furnishers of information, a creditor or other third party that provides information about consumer to a CRA, upon notice, to conduct a reasonable reinvestigation of all disputes with regard to the completeness or accuracy of any information it provides to the CRAs regarding a consumer and modify, delete, or permanently block any items of information found to be inaccurate, incomplete, or unverifiable after said reinvestigation is completed.

15.     Plaintiff's claims arise out of Trans Union's blatantly inaccurate credit reporting, wherein Trans Union reported to Plaintiff's potential creditors the consumer information of Plaintiff's twin brother on at least one occasion in the past two years.

16.     Accordingly, Plaintiff brings claims against Trans Union for failing to follow

reasonable procedures to assure the maximum possible accuracy of Plaintiffs credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b), and failing to conduct a reasonable reinvestigation to determine whether information Plaintiff disputed was inaccurate and record the current status of the disputed information, or delete the disputed information from Plaintiffs credit file, in violation of the FCRA, 15 U.S.C. § 1681i.

17.     Plaintiff also brings a claim against LVNV Funding for failing to fully and properly reinvestigate Plaintiff's dispute and review all relevant information provided by Plaintiff and Trans Union, in violation of the FCRA, 15 U.S.C. § 1681s-2(b)(1).

18.     As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs and attorneys' fees from the Defendants for their willful and/or negligent violations of the FCRA, 15 U.S.C. § 1681, *et seq.*, as described herein.

## PARTIES

19.     Plaintiff is a natural person residing in Bryans Road, Maryland, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

20.     Trans Union is a corporation with a principal place of business located at 555 West Adams Street, Chicago, Illinois 60661, and is authorized to do business in the State of Maryland, including within this District. Trans Union can be served through its registered agent Illinois Corporation Service Company located at 801 Adlai Stevenson Drive, Springfield, Illinois 62703.

21.     Trans Union is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Trans Union is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

22.     LVNV is a foreign corporation that regularly conducts business in Maryland on a

routine and systematic basis. LVNV is engaged in the business of collecting consumer debts. LVNV is a Delaware limited liability corporation with a principal place of business at 355 S Main Street, Ste 300-D, Greenville SC 29601. LVNV can be served through its registered agent CSC Lawyers Incorporating Service Company located at 7 St. Paul Street Suite 820, Baltimore, MD 21202.

23.     LVNV is a "furnisher" of consumer information, as contemplated in 15 U.S.C. § 1681s-2.

## JURISDICTION AND VENUE

24.     This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

25.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## SUMMARY OF THE FAIR CREDIT REPORTING ACT

26.     The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

27.     The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. *See* 15 U.S.C. § 1681(a).

28.     Specifically, the statute was intended to ensure that "consumer reporting agencies

adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information. *See* 15 U.S.C. § 1681(b).

29.     To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in consumer reports (15 U.S.C. § 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (15 U.S.C. § 1681i).

30.     The FCRA provides consumers with a private right of action against consumer reporting agencies that willfully or negligently fail to comply with their statutory obligations under the FCRA.

## **FACTUAL BACKGROUND**

31.     The United States Congress has found that the banking system is dependent upon fair and accurate credit reporting. Inaccurate consumer reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence, which is essential to the continual functioning of the banking system.

32.     Trans Union sells millions of consumer reports per day, and also sell credit scores.

33.     Pursuant to 15 U.S.C. § 1681e(b), consumer reporting agencies, like Trans Union, are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

34.     Pursuant to 15 U.S.C. §§ 1681b and 1681e(a), consumer reporting agencies, like Trans Union, must maintain reasonable procedures to assure that consumer reports are sold only

for legitimate "permissible purposes."

35.    Trans Union's consumer reports generally contain the following information:

(a)    **Header/Identifying Information:** this section generally includes the consumer's name, current and prior addresses, date of birth, and phone numbers;

(b)    **Tradeline Information:** this section pertains to consumer credit history, and includes the type of credit account, credit limit or loan amount, account balance, payment history, and status;

(c)    **Public Record Information:** this section typically includes public record information, such as bankruptcy filings; and,

(d)    **Credit Inquiries:** this section lists every entity that has accessed the consumer's file through a "hard inquiry" (i.e., consumer-initiated activities, such as applications for credit cards, to rent an apartment, to open a deposit account, or for other services) or "soft inquiry" (i.e., user-initiated inquiries like prescreening).

36.    Trans Union obtains consumer information from various sources. Some consumer information is sent directly to the CRA by furnishers, such as LVNV.

37.    The majority of institutions that offer financial services (e.g., banks, creditors, and lenders) rely upon consumer reports from CRAs (like Trans Union) to make lending decisions.

38.    Those institutions also use FICO Scores, and other proprietary third-party algorithms (or "scoring" models), including debt-to-income ratios, to interpret the information in a consumer's consumer report, which is based on the amount of reported debt, payment history, and date of delinquencies contained in Trans Union's consumer reports.

39.    The information Trans Union includes in a consumer report contributes to a consumer's overall creditworthiness and determines their FICO Scores.

40.    FICO Scores are calculated using information contained in Trans Union's consumer reports.

41.    Trans Union knows that FICO and other third-party algorithms (as well as the algorithms owned by Trans Union) use variables or "attributes" derived from a consumer's

consumer report to calculate a "credit score," which is a direct reflection of a consumer's creditworthiness.

42.     Trans Union knows that lenders also consider a consumer's debt-to-income ratio ("DTI") before deciding to extend credit or approve financing terms.

43.     DTI compares the total amount a consumer owes to the total amount a consumer earns.

44.     The higher the amount of reported debt that a consumer has, or appears to have, or is rather reported to have, the less favorable the consumer's DTI will be, and the more difficult it will be for a consumer to obtain credit and favorable credit terms. Rather, if offered credit at all, consumers will be offered less credit and at higher interest rates.

45.     Trans Union routinely reports inaccurate and materially misleading information about consumers like Plaintiff, without verifying or updating it as required by Section 1681e(b) of the FCRA.

46.     Trans Union fail to employ reasonable procedures to assure the maximum possible accuracy of the information that they report about consumers, including but not limited to, account balances, account statuses, payment histories, and payment statuses.

47.     Consumers have filed thousands of lawsuits and FTC and Consumer Financial Protection Bureau Complaints against Trans Union for its inaccurate credit reporting.

48.     Thus, Trans Union is on continued notice of its respective inadequate reporting procedures. Specifically, Trans Union is on notice that its inadequate procedures regularly result in the reporting of inaccurate balances, account statuses, payment histories, and payment statuses.

49.     Trans Union has received and documented many disputes from consumers complaining that Trans Union reported inaccurate information about them.

## The "Mixed File" Problem

50.     A recurring and *known* issue within the credit reporting industry is the creation of "mixed files."

51.     A "mixed file" occurs when personal and credit information belonging to Consumer *B* appears in one or more of Consumer *A*'s credit files.

52.     The Federal Trade Commission ("FTC") defined a mixed credit file as a file that "refers to a Consumer Report in which some or all of the information pertains to Persons other than the Person who is subject to that Consumer Report." *F.T.C. v. TRW, Inc.*, 784 F. Supp. 361, 362 (N.D. Tex. 1991).

53.     "Mixed files" create a false description and representation of a consumer's credit history and result in the consumer not obtaining credit or other benefits of our economy.

54.     Trans Union's procedures for matching consumer information to a consumer report often cause the mixing of one consumer with another.

55.     Another consequence of mixed files is the resulting disclosure of a consumer's most personal identifying and financial information absent the consumer's knowledge or consent, or both. This occurs when a consumer's file is mixed with that of another consumer, and either of those consumers applies for credit, housing, insurance, or employment, and Trans Union sells information pertaining to one consumer in response to the application of the other. This violates the consumer's privacy and also greatly increases their risk of identity theft.

## The "Mixed File" Problem is Known to Trans Union

56.     Mixed files are not a new phenomenon. Trans Union has been on notice of the existence of mixed files.

57.     In particular, Trans Union has been on notice of the fact that its procedures for

creating credit files, including its matching algorithms, are prone to frequently cause mixed files, for over forty (40) years. *See Thompson v. San Antonia Retail Merchants Ass'n*, 682 F.2d 509, 511 (5th Cir. 1982).

58.     Trans Union mixes files even though every consumer has unique personal identifying information, such as a Social Security Number. That is so because its systems allow information to be included in a consumer's file even when the Social Security Number reported with the information is different from the Social Security Number on the consumer's file.

59.     Trans Union knows that its matching procedures cause inaccurate consumer reports, consumer disclosures, and mixed files.

60.     In the 1990's, the FTC sued Experian's predecessor TRW (together with non-party Equifax and Trans Union) because of each entity's failure to comply with the FCRA including the mixing of consumers' files.

61.     In 1991, TRW signed a Consent Order with the FTC. To prevent the occurrence or reoccurrence of a mixed file, TRW agreed to use, for matching and identification purposes, a consumer's full identifying information, defined as full first and last name, full street address, zip code, birth year, any generational designation and Social Security Number.

62.     In the 1990's, the Attorneys General of numerous states sued Experian's predecessor TRW together with non-party Equifax and Trans Union because of each entity's failure to comply with the FCRA including the mixing of consumers' files.

63.     In 1992, Trans Union signed a Consent Order with the Attorneys General of 17 states. Trans Union agreed that it would maintain reasonable procedures to prevent the occurrence or reoccurrence of mixed files. For example, procedures during the reinvestigation process include, assigning mixed file cases to Senior Investigators who, as appropriate, must pull all files related to

the consumer, fully verify disputed information, make any changes, deletions or additions to correct the file and resolve the dispute, and prepare a summary of the problem to be filed with another department for corrective action.

64.     To prevent the occurrence of a mixed file, Trans Union together with non-parties Equifax and Experian entered into agreements not to place information in a consumer's file (other than certain public record information) unless it has identified such information by at least two of the following identifiers: (i) the consumer's name; (ii) the consumer's Social Security Number; (iii) the consumer's date of birth, or (iv) the consumer's account number with a subscriber or a similar identifier unique to the consumer.

65.     Trans Union and non-parties Equifax and Experian continue to repeatedly mix consumers' files despite agreements with the FTC and State Attorneys General and hundreds of lawsuits filed against them by consumers whose files have been mixed.

66.     When those lawsuits have gone to trial, juries have found that Trans Union and non-parties Equifax and Experian, willfully violated the accuracy and reinvestigation requirements of the FCRA - §§ 1681e(b) and 1681i – and awarded punitive damages as high as $18 million. Yet the "mixed file" problem persists.

67.     For example, in 2015, the New York Attorney General filed charges and settled claims with Trans Union and non-parties Equifax and Experian over mixed files.[1] *See In the Matter of Eric T. Schneiderman, Attorney General of the State of New York v. Experian Information Solutions, Inc.; Equifax Information Services, LLC; and Trans Union LLC.*

68.     In 2002, the jury in *Judy Thomas v. Trans Union LLC*, District of Oregon, Case No.

---

[1] https://ag.ny.gov/press-release/2015-ag-schneiderman-announces-groundbreaking-consumer-protection-settlement-three Last visited May 17, 2022; *see also* https://ag-ny.gov/pdfs/CRA%20Agreement%20Fully%20Executed%203.8.15.pdf Last visited May 17, 2022.

00-1150-JE, found Trans Union had willfully violated the FCRA by mixing Judy Thomas's personal and credit information with another consumer's and failing to unmix them despite Ms. Thomas' numerous disputes. The jury awarded Ms. Thomas $300,000.00 in actual damages and $5,000,000.00 in punitive damages.

69.     In 2007, the jury in *Angela Williams v. Equifax Information Services, LLC*, Circuit Court for Orange County Florida, Case No. 48-2003-CA-9035-0, awarded Angela Williams $219,000.00 in actual damages and $2,700,000.00 in punitive damages for willfully violating the FCRA by mixing Angela Williams with another consumer and failing to unmix them despite Ms. Williams' disputes.

70.     In 2013, the jury in *Julie Miller v. Equifax Information Services, LLC*, District of Oregon, Case No. 3:11-cv-01231-BR, awarded Julie Miller $180,000.00 in actual damages and more than $18,000,000.00 in punitive damages for willfully violating the FCRA by mixing Julie Miller with another consumer and failing to unmix them despite Ms. Miller' numerous disputes.

71.     More recently, a jury assessed a $60 million dollar verdict against Trans Union for mixing innocent persons as terrorists and drug dealers by matching consumers with the Office of Foreign Asset Control's "terrorist alert" list based on first and last name alone. *See Ramirez v. Trans Union, LLC*, No. 12-CV-00632-JSC, 2017 WL 5153280, at *1 (N.D. Cal. Nov. 7, 2017), *aff'd in part, vacated in part, rev'd in part sub nom. Ramirez v. TransUnion, LLC*, 951 F.3d 1008 (9th Cir. 20020).

72.     Despite these substantial verdicts, Trans Union continues to mix consumers' credit files with other consumers' credit files.

73.      Trans Union has been sued thousands of times wherein an allegation was made that Trans Union violated the FCRA.

74.     FCRA lawsuits have resulted in multi-million-dollar verdicts for consumers who fall victim to a mixed credit file.

75.      "Evidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument that strong evidence is required to cure the defendant's disrespect for the law." *Dalton v. CAI*, 257 F.3d 409, 418 (4th Cir. 2001) (noting that whether "other consumers have lodged complaints similar to Dalton's against CAI" is relevant to willfulness under the FCRA). Moreover, repeated noncompliance with statutory duties can establish that the defendants acted willfully. *See Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 53 (2007) (punitive damages can be awarded based on "reckless disregard for a statutory duty").

76.     No less than three federal Courts of Appeal have held a consumer reporting agency violates 15 U.S.C. § 1681e(b) and may be found to have willfully violated the FCRA when it mixes a consumer's file with another consumer.

77.     Notably, the FTC has specifically warned consumer reporting agencies to review their procedures when a mixed file occurs.

78.     Despite federal and state law, Congressional mandate, federal and state enforcement actions, and thousands of consumer lawsuits, mixed credit files remain a significant problem for innocent consumers, including Plaintiff.

## FACTUAL ALLEGATIONS

**Plaintiff Applied for Financing to Purchase a Home through Guaranteed Rate Affinity**

79.     Sometime in December 2022, Plaintiff and her wife were interested in purchasing a home for their family.

80.     The couple currently rent an apartment which they have to share with a roommate

and their four dogs.

81.     Plaintiff and her wife were interested in purchasing a home so they could have more privacy as a married couple and so their dogs could have a yard. Additionally, Plaintiff is a DJ and wanted a home of her own so she could play loud music without worrying about disturbing her roommate or other tenants in the building.

82.     Accordingly, Plaintiff contacted a real estate agent and the couple began searching for homes.

83.     On or about December 18, 2022, Plaintiff and her wife completed and submitted a joint application to obtain a mortgage from Guaranteed Rate Affinity, LLC ("Guaranteed").

84.     For Guaranteed to evaluate Plaintiff's creditworthiness, it would need to obtain copies of Plaintiff's and her wife's credit files. Plaintiff and her wife provided Guaranteed with their personal identifying information, including their Social Security Numbers, and authorized it to obtain copies of their credit files.

85.     On or about December 18, 2022, Guaranteed ordered a consumer report on Plaintiff from non-party FactualData.

86.     To create the consumer report ordered by Guaranteed, FactualData requested and obtained consumer credit information about Plaintiff from Trans Union and non-parties Equifax and Experian.

87.     The information FactualData obtained from Trans Union included numerous accounts and identification information that did not belong to Plaintiff. Rather, those accounts and identification information belonged to Plaintiff's twin brother Shaquil Terrell Hickman ("Shaquil Terrell").

88.     While Plaintiff shares the same birth date as her twin brother, they are in fact

separate human beings.

89.     Once FactualData obtained Plaintiff's information from Trans Union and non-parties Equifax and Experian, FactualData sold Plaintiff's consumer report to Guaranteed.

90.     On or about December 18, 2022, FactualData sold a report compiled from the consumer information published and sold by Trans Union concerning Plaintiff to Guaranteed in response to Plaintiff's and her wife's mortgage application.

**Guaranteed Denied Plaintiff's Mortgage Application**

91.     On or about December 18, 2022, Guaranteed received and reviewed FactualData's consumer report compiled from the consumer information published and sold by Trans Union concerning Plaintiff.

92.     On or about December 18, 2022, Guaranteed denied Plaintiff's mortgage application in reliance on information published and sold by Trans Union contained in the FactualData report concerning Plaintiff.

93.     Upon information and belief, Plaintiff's mortgage application was denied due to a DTI ratio that was too high.

94.     The DTI was calculated based upon the contents of Trans Union's consumer report published to Guaranteed concerning Plaintiff, which included accounts belonging to Shaquil Terrell.

95.     Trans Union inaccurately published in the consumer report to Guaranteed several pieces of information that did not belong to Plaintiff.

96.     Trans Union reported inconsistent information about Plaintiff to FactualData – which was prevalent throughout the FactualData's report.

97.     Specifically, Trans Union inaccurately published in the consumer report to

Guaranteed several pieces of information, including personal identifiers, accounts, debts, and obligations, which belonged to Shaquil Terrell.

98.     In the FactualData report, Trans Union mixed Plaintiff's file with Shaquil Terrell's consumer information despite the fact that Plaintiff has a different first and middle name, a different Social Security Number, a different address history, and a different gender than Shaqil Terrell.

99.     Trans Union mixed Plaintiff's consumer file with that of Shaquil Terrell.

100.    Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

<strong>Plaintiff's Mixed Credit File in June 2023</strong>

101.    Shocked, worried, and confused, in or around June 2023 Plaintiff requested a copy of her consumer reports from the major CRAs – including Trans Union.

102.    On or about June 26, 2023, Plaintiff secured a copy of her credit files from Trans Union through third-party Credit Karma.

103.    Upon reviewing the contents of consumer report, Plaintiff was shocked at the appearance of several pieces of information, including a name, an account, addresses, and two employers, within Plaintiff's Trans Union consumer report that did not belong to Plaintiff at all.

104.    Plaintiff's Trans Union report contained tradelines that Plaintiff did not recognize, including: 1) LVNV collection account (Account No. 444796270529XXX) ("LVNV Account"), with a $631 balance; 2) CarMax Auto Finance Account (Account No. 3469XXXX), with a $10,147 balance; 3) Navy Federal Credit Union (Account No. 4300138431XXXX); 4) Navy Federal Credit Union (Account No. 500001403216000165XXXX); 5) Omni Financial (Account No.

1420000000052609510XXXX);   6)   Possible   Financial   (Account   No.
25A6BKVOU9CN5Q3097RFVXXX) with a past due balance of $70; 7) a charged off World
Financial Company (Account No. 16080191XXXX); 8) Conn Appliances, Inc (Account No.
55376XXXX); 9) Omni Financial (Account No. 1420000000052609503XXXX); 10) Omni
Financial   (Account   No.   63824045509XXXX);   11)   Omni   Financial   (Account   No.
63824045507XXXX); 12) OneMain (Account No. 1121202800780XXXX); and 13) Source
Receivables Management collection account ("SRM Account") with a $1,269 balance.

105.     The information reported in these tradelines by Trans Union belongs to a
completely different consumer than Plaintiff, with entirely different personal identifying
information.

106.     Upon information and belief, the information above belongs to Shaquil Terrell.

107.     Trans Union confused Plaintiff with another consumer and mixed a number of
accounts and personal identifying information of another consumer into Plaintiff's credit file.

108.     Plaintiff was very confused and hopeless as it related to her credit file, and did not
understand why there was information in her credit report that did not belong to her.

109.     By reporting the aforementioned account, various other accounts, and other
personal information in the consumer file presumably about Plaintiff, despite the fact that the
accounts and information did not belong to Plaintiff, Trans Union failed to follow reasonable
procedures to assure the maximum possible accuracy of the information contained within
Plaintiff's credit files and consumer reports, in violation of 15 U.S.C. § 1681e(b).

**Trans Union's Method for Considering Consumer Credit Report Disputes**

110.     The credit industry has constructed a method of numeric-alpha codes for
considering consumer credit report disputes. *See* 15 U.S.C. § 1681i(a)(5)(D).

111.    The credit bureaus, including Trans Union, along with non-parties Equifax, Experian, and Innovis, have thus created the Online Solution for Complete and Accurate Reporting, or e-OSCAR, as the credit industries' standard of performance. e-OSCAR allows the credit bureaus to create and data furnishers to respond to disputes initiated by consumers by routing credit reporting agency-created prompts for automated consumer dispute verifications to the appropriate data furnishers. e-OSCAR utilizes a numeric-alpha language specific to the credit reporting industry.

112.    That lexicon or unique language is commonly referred to in the credit reporting industry as "Metro 2 Format" or "Metro 2."

113.    It is also known industry wide as the CDIA's "Credit Reporting Resource Guide."

114.    Metro 2 is driven by numeric codes that translate into specific alpha representations about consumers' creditworthiness and character that will ultimately appear on credit reports issued to third parties who make credit, insurance, rental, and employment decisions regarding consumers.

115.    Metro 2 codes are used on an industry wide form known within the credit industry as an ACDV electronic form.

116.    The ACDVs have many fields in their body for use in effecting thorough and complete communications between data furnishers and the credit reporting agencies.

117.    These ACDV "fields" have various titles for the many substantive areas into which the Metro 2 codes can be entered.

118.    Upon receiving a dispute from a consumer, the credit bureaus have an automated system that prepares ACDVs that are sent to each of the data furnishers that are reporting the credit accounts disputed by a consumer.

119.    The data furnishers, like LVNV, then have an obligation under the FCRA to conduct a reasonable reinvestigation with respect to the disputed credit account and review all relevant information provided by the consumer with the dispute to determine whether the disputed credit account information is accurate and/or belongs to the disputing consumer. *See* 15 U.S.C. § 1681s-2(b).

120.    Once the data furnisher completes its reinvestigation, it will code the ACDV accordingly, representing either that the disputed account was verified as accurate and belonging to the disputing consumer, updating information related to the account, or deleting the account entirely, and return the ACDV to the respective credit bureau(s) via e-OSCAR.

**Plaintiff Disputed the Mixed file with Trans Union**

121.    In or around June 2023, Plaintiff had only identified the LVNV and SRM Accounts as belonging to another consumer.

122.    On or about June 27, 2023, extremely shocked, surprised, and embarrassed at Trans Union's inaccurate reporting, Plaintiff disputed the LVNV and SRM Accounts with Trans Union through Credit Karma.

123.    Upon information and belief, Plaintiff explained that any notation that debt owed to LVNV and SRM Accounts did not belong to her and therefore should not be reported in her Trans Union consumer reports.

124.    Upon information and belief, Plaintiff requested that Trans Union reinvestigate the disputed information, correct the reporting, and to send her a corrected copy of her credit report.

125.    Upon information and belief, Trans Union received Plaintiff's June 2023 dispute.

**Trans Union's Unreasonable Dispute Reinvestigation**

126.    Upon information and belief, Trans Union sent LVNV and Source Receivable

Management an automated credit dispute verification ("ACDV") form, pursuant to Plaintiff's June 2023 dispute to Trans Union.

127.    Trans Union removed the SRM Account from Plaintiff's credit file, however Trans Union verified Plaintiff's LVNV Account as accurate and continued to include the LVNV Account in Plaintiff's consumer file.

128.    Upon information and belief, Trans Union failed to adequately review all of the information provided to it by Plaintiff in support of Plaintiff's dispute.

129.    Upon information and belief Trans Union failed to conduct a reasonable reinvestigation of Plaintiff's June 2023 dispute.

130.    Thereafter, Trans Union failed to correct or delete the LVNV Account appearing in Plaintiff's credit file.

131.    Trans Union failed to conduct a reasonable reinvestigation of Plaintiff's dispute tendered June 2027, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

**LVNV's Unreasonable Dispute Reinvestigation**

132.    Upon information and belief, in or around June or July of 2023, LVNV received Trans Union's ACDV and failed to conduct a reasonable investigation with respect to the information disputed by Plaintiff.

133.    Upon information and belief, LVNV failed to review all relevant information provided by Trans Union regarding Plaintiff's dispute tendered in or about June or July 2023.

134.    Upon information and belief, LVNV verified the disputed information as accurate to Trans Union on or about July 6, 2023.

135.    LVNV violated 15 U.S.C. § 1681s-2(b) by failing to conduct a reasonable investigation with respect to the disputed information, failing to review all relevant information available to it, and failing to modify, delete, or permanently block the disputed information that was inaccurate, incomplete or unverifiable.

136.    Plaintiff reasonably believes that LVNV continued to furnish data to the national credit bureaus inaccurately suggesting that Plaintiff was owed a debt to LVNV beginning in February 2023 and following Plaintiff's June 2023 dispute.

137.    Plaintiff reasonably believes that Trans Union continued to publish that Plaintiff owed a debt to LVNV from in or around February 2023 and following Plaintiff's June 2023 dispute.

138.    As a result of the inaccurate inclusion of the LVNV Account, the Defendants made it practically impossible for Plaintiff to continue to obtain credit or a mortgage.

**Plaintiff Applied for Credit Again**

139.    Following the mortgage denial, Plaintiff was interested in building her credit in order to improve her chances of obtaining a mortgage.

140.    Plaintiff received a number of credit card offers so she reasonably believed she would be eligible for and approved for credit.

141.    On or about November 28, 2023, Plaintiff applied for credit with Synchrony Bank/Amazon.

142.    Upon information and belief, on or about November 28, 2023, Trans Union sold a consumer report concerning Plaintiff to Synchrony Bank/Amazon in response to Plaintiff's credit application.

143.    On or about December 8, 2023, Plaintiff completed additional credit applications

with FebDestiny and OneMain Financial.

144.    Upon information and belief, on or about December 8, 2023, Trans Union sold consumer reports concerning Plaintiff to FebDestiny and OneMain Financial in response to Plaintiff's credit application.

145.    After reviewing the report that each received from Trans Union, Synchrony Bank/ Amazon, FebDestiny and OneMain **all** denied Plaintiff's credit applications.

146.    Upon information and belief, the reason that Plaintiff was denied credit was because the creditors received a credit report from Trans Union that inaccurately reported credit information belonging to Shaquil Terrell.

**Plaintiff's Mixed Credit File Worsened Through January 2024**

147.    Shocked, worried, and confused, Plaintiff requested another copy of her consumer reports from the CRAs – including Trans Union around the beginning of 2024.

148.    On or about January 5, 2024, Plaintiff secured a copy of her credit files from Trans Union and non-parties Experian and Equifax.

149.    Upon review, Plaintiff was horrified to learn that in addition to the inaccurate accounts included in her June 26, 2023 consumer report, there were **two new accounts** on her consumer report that did not belong to her.

150.    Specifically, Plaintiff did not recognize: 1) a collection account Army/Air Force Exchange (Account No. 653002000201XXXX) and 2) a charged off Capital One (Account No. 517805758744XXXX).

151.    Upon information and belief, each of these accounts belonged to Shaquil Terrell.

152.    Trans Union also was reporting inquiries on Plaintiff's consumer report, which Plaintiff did not recognize, including: 1) JPMCB CARD SERVICES on September 20, 2023; 2)

SALLIE MAE BANK on December 19, 2022; 3) CROSSCOUNTRY MTG LLC via FDCROSSCOUNTRY MORTGAGE on November 11, 2022; 4) TBOMVERVENT First Access on April 17, 2022; and 5) VETERANS UNITED HOME via EMSVETERANS UNITED HOME on April 11, 2022.

153.    Upon information and belief, each and every one of these inquiries were initiated by Shaquil Terrell.

154.    Trans Union was also reporting addresses on Plaintiff's consumer report that did not belong to Plaintiff, including: 1) 10122 TRAILHEAD PASS SAN ANTONIO, TX 78251-3257; 2) 7727 POTRANCO RD APT 3207 SAN ANTONIO, TX 78251-2003; 3) 534 PERRIN ST APT B COLORADO SPRIN 6220 PRAIRIE HILLS VW APT 301 COLORADO SPRINGS, CO 80923-3543; 4) 534 PERRIN ST APT B COLORADO SPRIN 6220 PRAIRIE HILLS VW APT 301 COLORADO SPRINGS, CO 80923-3543 GS, CO 80916-5163; 6) 6220 PRAIRIE HILLS VW APT 301 COLORADO SPRINGS, CO 80923-3543; 7) 533 PERRIN ST APT E COLORADO SPRINGS, CO 80916-5156; 8) 330 MCGUIRE ST COLORADO SPRINGS, CO 80916-5291; 9) 3207-10122 TRAILHEAD PASS SAN ANTONIO, TX 78251; 10) LLEY FRG PLEASANTON, TX 78064-0226; and 11) 29611 BAREFOOT CIR SUN CITY, CA 92585-9278.

155.    Trans Union was also reporting phone numbers on Plaintiff's consumer report that did not belong to Plaintiff, including: 1) (917) 574-4946; 2) (347) 977-3116; 3) (540) 841-7484; 4) (540) 845-1941; 5) (703) 726-2611; 6) (212) 289-9654; 7) (540) 424-6645; 8) (532) 299-2994; 9) (917) 574-4045; 10) (719) 308-0499; 11) (703) 416-9715; 12) (416) 971-9714; and 13) (719) 556-4180.

156.    Finally, Trans Union was also reporting employment information on Plaintiff's consumer report for companies Plaintiff has never worked for, including Lockland AFB/VA

Disabled and the Air Force.

157.    Upon information and belief, the aforementioned accounts, inquiries, addresses, phone numbers, and employment information belong to Shaquil Terrell.

158.    By reporting the aforementioned accounts and other personal information in the consumer file presumably about Plaintiff, despite the fact that the accounts and information **did not** belong to Plaintiff, Trans Union failed to follow reasonable procedures to assure the maximum possible accuracy of the information contained within Plaintiff's credit files and consumer reports, in violation of 15 U.S.C. § 1681e(b).

**Plaintiff Sustained Damages as a result of the Defendants' Conduct**

159.    As a direct result of the inaccurate information reported by Trans Union, as well as the failures to reinvestigate by both Trans Union and LVNV, Plaintiff has sustained severe emotional distress. Specifically, Plaintiff has suffered from substantial amounts of anxiety and stress due to the Defendants' conduct.

160.    As a result of the "mixed file," Trans Union made it practically impossible for Plaintiff to obtain credit, build her credit history, and further establish her creditworthiness to obtain credit and obtain a mortgage for her and her family.

161.    Plaintiff has also suffered with issues related to loss of sleep, as Plaintiff's constant state of anxiety and distress has regularly made it difficult for Plaintiff to fall asleep and/or stay asleep throughout the night.

162.    Plaintiff has felt depressed and hopeless as a result of Defendants' inaccurate reporting and failure to fix Plaintiff's credit file.

163.    Plaintiff feels as though she has no chance of obtaining credit in the future.

164.    Plaintiff lives in fear that her file may be mixed with another consumer again.

165.    Upon information and belief, between December 2022 through the filing of this Complaint, Plaintiff has attempted to obtain credit but had been repeatedly denied based on information contained in Plaintiff's consumer reports published and sold by Trans Union.

166.    Plaintiff and her wife have been forced to hold off on obtaining a mortgage to purchase a home for over a year. Plaintiff and her wife have been forced to put on hold their desire to start and raise their family in their own home.

167.    Plaintiff is still unable to obtain a mortgage, and has been discouraged, or "chilled" from applying for credit and mortgage because she knows she will be denied.

168.    Plaintiff feels as though she is disappointing her wife because she is unable to jointly apply for credit or loans with her wife.

169.    Plaintiff is experiencing mood swings due to the stress and frustration from not being able to purchase a home for herself and her family.

170.    Plaintiff suffers from Post Traumatic Stress Disorder, and the stress and anxiety caused by Trans Union's inaccurate reporting substantially exacerbated Plaintiff's condition.

171.    At all times pertinent hereto, Defendants were acting by and through their agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendants herein.

172.    At all times pertinent hereto, the conduct of Defendants, as well as that of their respective agents, servants, and/or employees, was intentional, willful, reckless, grossly negligent and in utter disregard for federal law and the rights of Plaintiff herein.

173.    As a standard practice, Trans Union does not conduct independent investigations in response to consumer disputes. Instead, it merely parrots the response of the credit furnisher, such as LVNV, despite numerous court decisions admonishing this practice. *See Cushman v. Trans*

*Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997) (The 'grave responsibilit[y]' imposed by § 1681i(a) must consist of something more than merely parroting information received from other sources. Therefore, a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute."); *Apodaca v. Discover Fin. Servs.*, 417 F. Supp. 2d 1220, 1230-31 (D.N.M. 2006) (noting that credit reporting agencies may not rely on automated procedures that make only superficial inquiries once the consumer has notified it that information is disputed); *Gorman v. Experian Info. Sols., Inc.*, 2008 WL 4934047, at *6 (S.D.N.Y. Nov. 19, 2008).

174.     Trans Union is aware of the shortcomings of its procedures and intentionally chooses not to comply with the FCRA to lower its costs. Accordingly, Trans Union's violations of the FCRA are willful.

175.     As a result of Defendants' conduct, action, and inaction, Plaintiff suffered damages including but not limited to, damage by loss of credit; loss of ability to purchase and benefit from her good credit rating; detriment to her credit rating; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and having another consumer's personally identifying information and credit information, including inquiries, mixed into Plaintiff's credit file.

**CLAIMS FOR RELIEF**

**COUNT I**
**15 U.S.C. § 1681e(b)**
**Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy**
**(First Claim for Relief Against Union LLC only)**

176.     Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

177.     The FCRA imposes a duty on consumer reporting agencies to devise and implement

procedures to ensure the "maximum possible accuracy" of consumer reports, as follows: "Whenever a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure **maximum possible accuracy** of the information concerning the individual about whom the report relates." 15 U.S.C. §1681e(b) (emphasis added).

178.    On at least one occasion, since 2022 Trans Union prepared patently false consumer reports concerning Plaintiff.

179.    On numerous occasions, Trans Union mixed another consumer's personal and credit account information into Plaintiff's credit file, thereby misrepresenting Plaintiff, and ultimately, Plaintiff's creditworthiness.

180.    Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

181.    As a result of Trans Union's' conduct, action, and inaction, Plaintiff suffered damages including but not limited to, damage by loss of credit; loss of ability to purchase and benefit from her good credit rating; detriment to her credit rating; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and having another consumer's personally identifying information and credit information, including inquiries, mixed into Plaintiff's credit file.

182.    Trans Union's conduct, actions, and inactions were willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, Trans Union was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

183.    Plaintiff is entitled to recover attorneys' fees and costs from Trans Union in an

amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT II**
**15 U.S.C. § 1681i**
**Failure to Perform a Reasonable Reinvestigation**
**(Second Claim for Relief Against Trans Union only)**

184.    Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

185.    The FCRA mandates that a CRA conducts an investigation of the accuracy of information "[I]f the completeness or accuracy of any item of information contained in a consumer's file" is disputed by the consumer. *See* 15 U.S.C. § 1681i(a)(1). The Act imposed a 30-day time limit for the completion of such an investigation. *Id.*

186.    The FCRA provides that if a CRA conducts an investigation of disputed information and confirms that the information is in fact inaccurate or is unable to verify the accuracy of the disputed information, the CRA is required to delete that item of information from the consumer's file. *See* 15 U.S.C. § 1681i(a)(5)(A).

187.    On at least one occasion during the past two years, Plaintiff disputed the inaccurate information with Trans Union and requested that it correct and/or delete a specific item in her credit file that is patently inaccurate, misleading, and highly damaging to her, namely, the LVNV Account.

188.    In response to Plaintiff's dispute, Trans Union failed to conduct a reinvestigation, or such investigation was so shoddy as to allow patently false, logically inconsistent, and damaging information to remain in Plaintiff's credit file.

189.    Trans Union violated 15 U.S.C. § 1681i by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the

30-day period beginning on the date on which they received the notices of dispute from Plaintiff; and by failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's credit file.

190.    As a result of Trans Union's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from her good credit rating; detriment to her credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

191.    Trans Union's conduct, actions, and inactions was willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, Trans Union was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

192.    Plaintiff is entitled to recover attorneys' fees and costs from Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT III**
**15 U.S.C. § 1681b(a)**
**Furnishing a Credit Report Without a Permissible Purpose**
**(Third Claim for Relief Against Trans Union only)**

193.    Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

194.    This action involves the willful, knowing, and/or negligent violation of the FCRA relating to the dissemination of consumer credit and other financial information.

195.    Plaintiff is a "consumer" as defined by the FCRA.

196.    Trans Union is a consumer reporting agency that furnishes consumer reports as

defined and contemplated by the FCRA.

197.    The FCRA prohibits any consumer reporting agency from furnishing a consumer report unless it has a permissible purpose enumerated under the FCRA, 15 U.S.C. § 1681b(a).

198.    On multiple occasions since at least 2022, Trans Union furnished Plaintiff's credit report to various entities without a permissible purpose in response to credit applications of another, which did not involve Plaintiff, and which Trans Union therefore had no reason to believe that those various credit-issuing entities intended to use Plaintiff's credit information in connection with a credit transaction involving Plaintiff, in violation of 15 U.S.C. § 1681b(a).

199.    Trans Union violated 15 U.S.C. § 1681b(a) by selling Plaintiff's credit report to third parties, whom did not have a permissible purpose to Plaintiff's credit report, in relation to the credit application of an unrelated consumer.

200.    As a result of Trans Union's conduct, action, and inaction, Plaintiff suffered damages including but not limited to, the loss of her right to keep her private financial information confidential; the loss of her right to information about who was viewing her private financial information and how her private financial information was improperly implicated in the credit applications of another; damage by loss of credit; loss of ability to purchase and benefit from her good credit rating; detriment to her credit rating; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and having another consumer's personally identifying information and credit information, including inquiries, mixed into Plaintiff's credit file.

201.    Trans Union's conduct, actions, and inactions was willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, Trans Union was negligent, entitling Plaintiff to

recover under 15 U.S.C. § 1681o.

202.    Plaintiff is entitled to recover attorneys' fees and costs from Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT IV**
**15 U.S.C. § 1681s-2(b)**
**Failure to Conduct an Investigation of the Disputed Information and Review all Relevant**
**Information Provided by the Consumer**
**(Only Claim for Relief Against LVNV Funding LLC)**

203.    Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

204.    LVNV furnished the inaccurate information relating to Plaintiff to the national credit bureaus, including but not limited to Equifax, Experian, and Trans Union.

205.    LVNV violated 15 U.S.C. § 1681s-2(b) by failing to investigate Plaintiff's dispute, or otherwise by failing to fully and properly investigate Plaintiff's dispute(s), including but not limited to failing to review all relevant information regarding the same; by failing to permanently and lawfully correct its own internal records to prevent the re-reporting of the inaccurate information relating to Plaintiff to the national credit bureaus, including but not limited to Trans Union; and, by failing to cease furnishing inaccurate information relating to Plaintiff to the national credit bureaus, including but not limited to Trans Union.

206.    As a result of LVNV's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from her good credit rating; detriment to her credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

207.    LVNV's conduct, action, and inaction was willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, LVNV was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

208.    Plaintiff is entitled to recover attorneys' fees and costs from LVNV in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

i.      Determining that Defendants negligently and/or willfully violated the FCRA;

ii.     Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;

iii.    Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and,

iv.     Granting further relief, in law or equity, as this Court may deem appropriate and just.

### DEMAND FOR JURY TRIAL

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.


Dated: February 27, 2024                    */s/ Levi Y. Eidelman*
                                            Levi Y. Eidelman, MD Bar No. 30903
                                            **CONSUMER ATTORNEYS**
                                            300 Cadman Plaza West, 12th Floor, Suite 12049
                                            Brooklyn, NY 11201
                                            T: (718) 360-0763
                                            E: leidelman@consumerattorneys.com

                                            *Attorneys for Plaintiff,*
                                            *Shaquae Michelle Hickman*